UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 21-80107-CR-RLR

UNITED STATES OF AMERICA,

v.

DENNIS POLLARD,

        Defendant.
_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE

COMES NOW, the United States of America, hereby files this response to the defendant's sentencing memorandum and request for downward variance, and states as follows:

Dennis Pollard, a now 68-year-old, former Palm Beach School District maintenance employee[1], was not a man who could help poor Pilipino women and their children, and young girls, get out of poverty; he only pretended to be one on the Internet. From at least as early as 2015, Pollard, engaged in numerous "relationships" with young girls, woman who offered their infant children for money, and anyone who would be his submissive sexual partner, for his own sexual desires. For years, Pollard preyed on young girls and children for his own personal and sexual desires. Pollard may not have physically touched these children, but Pollard *did* victimize them. When he asked the victims for pictures, they acquiesced; and, when he asked to receive nude and masturbatory pictures of the victims, they produced the same.

Federal District Judge John R. Adams, in *United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010), used a quote attributed to Nelson Mandela: "There can be no keener revelation of a society's soul than the way in which it treats its children." *Id.* at 847. Pollard's

---

[1] *See* Report by Dr. Samenow, Defense Exhibit A attached to DE 32.

conduct was disturbing and designed to prey on young girls for his own sexual desires. When that wasn't enough, he found women who would produce their own children in sexual acts, in the hopes that Pollard would pay money. The Defendant's conduct, taken with the sentencing factors set forth in 18 U.S.C. § 3553(a), demands a sentence of the highest order. The guidelines recommend life, and Pollard's actions in this case, despite his upbringing and basis for a variance, do not provide this Court any reason to vary downward. Regardless of any guideline calculation, the aggravating factors in this case far outweigh any mitigating factors in favor of a downward variance and demand a just and powerful sentence.

## FACEBOOK COMMUNICATIONS

Pollard spent years on Facebook Messenger searching out women that he could have a sexual dominant-submissive relationship with. He sought out hundreds of women and girls using similar "pickup lines" each time. And much like a good fisherman, when he got a bite (or in this case a response), he did not let go. As time went on Pollard became more aggressive in his behavior.

First, using his Dennis.Pollard.5602 Facebook account, Pollard solicited child pornography, sent child pornography and tried to solicit people he believed to be minors to produce child pornography from December 2015 through March 2016, when Facebook became aware of his actions and banned him. He did this hundreds of times. The PSR details Pollards criminal episodes in paragraphs twenty-seven through thirty-six. We find a man without any inhibitions of how young the child was he spoke to or how young the children were in the sexual abuse images he collected. Each of these children were in the Philippines. In particular, to one child, Pollard requested photos where he "want u shave. Show me no bra. Where u live." PSR ¶ 27. Throughout his communications, requests and demands, Pollard wanted to have dominance over these poor

foreign children, without any remorse.

The government was unable to determine Pollard's online activity between 2016 and 2020. Then, Pollard utilized his dennis.pollard.9279 Facebook to commit similar acts from May 26, 2020, through October 31, 2020. PSR ¶ 10. Without any information on his activity during the four-and-half years between these accounts, the government would not speculate as to his activity, however, the communication beginning in 2000 was significantly elevated in the types of requests, and longevity of the relationships.

Pollard's communication with user A.M.D. from September 7 – 28, 2020 is his quintessential conversation. He caused A.M.D., whom he believed to be the mother of two toddler-aged children, to sexually molest her children, and have them perform acts on each other. The videos produced of these children show they are less than 5-year-old. Per Pollard's request, A.M.D. had the children play with A.M.D.'s vagina, had them play with each other's pubic regions, and had them perform oral sex on A.M.D. When A.M.D. was unable to produce the videos per Pollard's request, he threatened to leave her and forgo the money he has promised her. PSR ¶ 11. Pollard was specific in what A.M.D. was to, and did, produce:

| | | |
|---|---|---|
| Defendant | 1:32:12 AM | Put your tongue in her pussy since don't do what I said |
| Defendant | 1:32:29 AM | In her pussy with tongue |
| Defendant | 1:33:17 AM | Not little lick put in her pussy slut |
| Defendant | 1:33:47 AM | Obey your master I'm sleeping |
| A.M.D. | 1:35:10 AM | Ok do you sleep ilove u master |
| Defendant | 1:35:45 AM | Love you now obey tongue in pussy |
| A.M.D. | 1:36:55 AM | I am lick pussy daughter |
| Defendant | 1:37:49 AM | No tongue in pussy slut |

PSR ¶ 14. The images and videos A.M.D. sent in response to Pollard's specific requests, were nothing short of horrible and abusive:

    (a) A.M.D.'s child or children walking naked on at least six occasions

    (b) A.M.D. sucking her child's nipple;

    (c) A.M.D. licking/kissing her daughter's vagina on at least eighteen occasions;

    (d) A.M.D. licking or sucking her son's penis on at least three occasions;

    (e) A.M.D. sucking her son's penis and then her daughter's vagina;

    (f) A.M.D. using a baby bottle to penetrate her daughter's vagina on at least two occasions;

    (g) A.M.D.'s children perform oral sex on each other in the shower; and

    (h) A.M.D.'s toddler rubbing A.M.D.'s vagina on at least twenty occasions.

PSR ¶ 17.

And then there was "S." A child who appeared to be about 13 years' old from her images and videos, and told the defendant she was 13 years' old. PSR ¶ 20. There relationship began with simple communication, then lead to an inquiry about the child's sexuality, what she has done sexually with others, acts of incest she may have participated in, and finally an offer of money in exchange for her production of child pornography. PSR ¶¶ 18-24. Their communication extended for the better part of seven (7) weeks until Pollard's account was shut down. PSR ¶ 18. Pollard was so convincing in his grooming tactics of "S", that they eventually professed their love for each other. *Id.* To drive their sexual relationship, Pollard sent "S" at least 28 photographs of his penis, adult pornography more than 50 times, and "S's" own production of child pornography as directed by Pollard back to her at least 25 times. PSR ¶ 20.

This was no fantasy relationship. Pollard's genuineness was epitomized in his sending a clothed photograph of his own real granddaughter. *Id.* "To encourage S. to engage sexually and produce CSAM, the defendant talked about his sexual relationship with others in the Philippines,

sent images and videos of A.M.D., videos of A.M.D.'s children playing on the floor, CSAM of A.M.D.'s children on at least 30 occasions, and videos of A.M.D. masturbating on at least fifteen 15 occasions. The defendant told S. about an online sexual relationship he had with a 36-year-old mother and her 15-year-old daughter that had gone on for the past two years." *Id.*

"S" even sent photographs of herself at the Western Union in the Philippines where she went to receive the money Pollard sent in exchange for the dozens of child pornography images "S" produced.  PSR ¶ 21.  "S" would describe and show her deplorable living conditions, and Pollard's response would be a request for more sexual images.  "In fact, in communicating with S., their conversations were so sexually charged that the defendant wrote, 'I forget sometimes that you are a child.'"  PSR ¶ 23.  The images and videos "S" sent in response to Pollard's specific requests, were nothing short of horrible and abusive:

> (a) "S" squatting naked;
> (b) separate seven-minute and four-minute videos in which "S" stripped naked and masturbated with her fingers and a bottle;
> (c) a video in which "S" masturbated using a corn cob per the defendant's request;
> (d) a video in which "S" urinated into a bottle and drank the urine;
> (e) a video of "S" topless while a man walked behind her in the background;
> (f) a video of "S" showering and brushing her teeth outside using a basis of water and then showing her breasts; and
> (g) a video where "S" trimmed her pubic hair.

PSR ¶ 22.

But for law enforcement's interception of Pollard based upon the tips Facebook provided to the National Center for Missing and Exploited Children, there is little doubt that Pollard would still be abusing "S" and countless other children.  After his arrest Pollard denied to his own daughter his commission of the offenses.  PSR ¶ 46.  When she asked him if this was about "kiddi

porn," Pollard responded, "that's what [the police] are saying." *Id.*

## CALCULATION OF THE ADVISORY GUIDELINE RANGE

The advisory sentencing guideline range, as calculated in the PSR, per Section 2G2.2 of the Sentencing Guideline Manual, is Life imprisonment because the total offense level is 43 and the criminal history category is II (PSR ¶¶ 72, 76).  The guidelines calculation is derived from the two (2) types of charges Pollard has been convicted of, covered by two (2) different guidelines.

First, Pollard's activity in soliciting A.M.D. to produce child pornography of her infant children via Facebook messenger, would be calculated pursuant to U.S.S.G. § 2G1.3 (PSR ¶ 54). However, because Pollard's actions of receiving, distributing and possessing child pornography, calculated pursuant to U.S.S.G. § 2G2.2 (PSR ¶ 54) are higher, the probation department used this guideline.

U.S.S.G. § 2G2.2, attributable to Counts 3, 5 and 6, under the charge of distribution of child pornography, began with a base offense level of 22 (PSR ¶ 58), Pollard's adjusted offense level rose to 45 (PSR ¶ 68) because he:

- possessed child pornography of children under 12 (2 levels) (PSR ¶ 59);
- distributed the same in exchange for more of the same (5 levels) (PSR ¶ 60);
- had an offense that involved material portraying S & M (4 levels) (PSR ¶ 61);
- engaged in a pattern of sexual exploitation of a minor (5 levels) (PSR ¶ 62);
- used a computer (2 levels) (PSR ¶ 107); and
- possessed more than 600 images of child pornography (5 levels) (PSR ¶ 108)[2].

Pollard then received a five-level increase pursuant to the U.S.S.G. Chapter 4 enhancement which qualified him as a repeat and dangers sex offender against minors (PSR ¶ 69) and a 3-level

---

[2] In fact, he possessed more than 19 videos files (PSR ¶ 45) of child pornography on his personal devices and distributed and received hundreds more via Facebook (*see* PSR generally).

reduction for acceptance of responsibility (PSR ¶¶ 70,71), for an offense level of 47. Because 43 is the highest possible offense level, his total offense level (TOL) had to be 43 (PSR ¶ 72). With a criminal history category I, the sentencing guideline range is Life.

Pollard asked this Court to effectively disregard the sentencing guidelines in his case by imposing a downward variance from the advisory guideline range to a mere 10 years. This is not appropriate under 18 U.S.C. § 3553(a)$^3$ and contrary to Eleventh Circuit case law.

### RESPONSE TO DEFENDANT'S 4 REASONS FOR VARIANCE

Pollard identified what the government has understood to be four (4) general grounds for this Court to vary from the guidelines. The defendant claimed that a variance down to the minimum mandatory sentence of 10 years' imprisonment was appropriate because of his: 1) advanced age, poor health, likely death in prison, 2) never physically touching a child sexually, 3) small likelihood of reoffending, and 4) that the sentencing guidelines do not differentiate the defendant's crime from those who committed more heinous acts. The government concedes several of these facts, as noted below, but not one provides this Court a valid basis to vary below the guidelines. Moreover, the defendant did not ask for, nor provide, a legal basis for departure from the guidelines. He did not, because not a single basis for departure applied. Pollard's attempt to pull on the Court's heart-strings (*see* DE 32:9), begging for mercy must fail. And whereas Pollard failed to provide mercy or help to his victims, the dozens that there were, this Court must show him the same in return.

---

$^3$ The following are the factors outlined in Section 3553(a): (i) The nature and circumstances of the offense and the history and characteristics of the defendant; (ii) The need for the sentence imposed – (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) The kinds of sentences available; (iv) The kinds of sentence and the sentencing range established for the instant offense by the Guidelines; and (v) Any pertinent policy statements issues by the United States Sentencing Commission. *See* 18 U.S.C. § 3553(a).

## I. Advanced Age, Poor Health, Likely Death In Prison Are Not Reasons to Depart

The Defendant argues that his advanced age, poor health, and likely death in prison, are reasons for this Court to depart from the guidelines (DE 32:1-3).

The single best predictor of whether the defendant will be caught committing a new crime is the age of the defendant, which means that the longer he is in prison, the older he will be when he gets out and thus the lower his risk of getting caught committing a new crime. Therefore, the best way to protect the community is the very obvious method of incarcerating him for an extended period of time until he is highly unlikely to get caught committing a new crime. The younger he is when he is released, the higher the risk. Moreover, because Pollard's crimes were committed while using the Internet, his age is not a deterrent to repeated crimes.[4] As evidence from his two periods of offending, Pollard appears to have only become more abusive and demonic in his solicitation of children and child pornography as he has aged.

Pollard has endured a number of illnesses in his life; several during the period of his current criminal episodes. Those illnesses did not prevent him from committing crimes against children. For Pollard, who committed his crimes throughout his 60s, not stifled in the least by any of his number of illnesses, a 120-month sentence, as requested, will not alter his desires or ability to recommit these sexual crimes against children.

And unfortunately for us all, death is a part of life. When a criminal commits heinous offenses during his later years, it may mean that death will come while in prison. Age should not a determining factor in sentencing when it had nothing to do with the crime; the crimes committed,

---

[4] Individuals have been criminally charged in this district related to internet crimes against children at similar or more advanced ages than Pollard. *See United States v. Jasperse,* 21-CR-80025-KAM (SD Fla 2021) (65 years old when online in Kik chat rooms possessing, receiving and distributing child pornography; sentenced to 60 months BOP); *United States v. Aellis*, 18-CR-80075-RLR (SD Fla 2018) (79 years old when sent child pornography online via email; sentenced to 97 months BOP)

the result on its victims, and deterrence, both specific and general, are the most influential factors.

Not mentioned specifically in his motion for variance, but alluded to in Dr. Samenow's report, Pollard should have sex offender treatment. But this is likewise not a reason to vary. In fact, while in prison, the defendant will be offered therapy. The Bureau of Prisons offers significant treatment for sex offenders at nine (9) of its institutions, some of which include a high intensity 18-month residential treatment program.[5] The Bureau of Prisons has even issued a 31-page statement outlining, specifically, the treatment offered to sex offenders.[6]

**II.**  Having Never Physically Touched A Child Sexually Is Not A Basis to Vary

Pollard offers that because he never touched a child in the course of these crimes, his actions are less culpable and deserve less punishment. DE 32:3. He also suggests that because the government cannot identify the children in the photographs as of the date of his filing, and therefore cannot decisively prove the images were produced at his request and at some earlier time, that he is less culpable and deserve less punishment. *Id.*

Pollard's sexual interest in children, from toddlers to teenagers, for years and years, demonstrates his dangerousness. While he never "physically threatened or extorted them" or "touched or attempted to touch them," Pollard did everything he could to take their innocence. *Id.* And from the communications, it is abundantly clear that the images and videos that A.M.D. and "S" produced, were done so because of Pollard's request.

Dr. Samenow's report finds that "the evidence is somewhat mixed as to whether Mr. Pollard has pedophilic disorder (recurrent, intense, sexual interest in prepubescent children)." Samenow Report at 11. And whether he has a pedophilic disorder, which is defined in the DSM-

---

[5] https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp
[6] https://www.bop.gov/policy/progstat/5324_010.pdf

5 as a "*recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child that occurs for at least six months and, is either acted upon or causes marked distress or interpersonal difficulty*," or pedophilic interest (as these terms are used interchangeably by Dr. Samenow), it is clear that but for Facebook reporting Pollard prior to his 6-month relationship with A.M.D., he had a recurrent, intense sexually behaviors involving sexual activity with a prepubescent child and caused interpersonal difficulty.

Dr. Samenow also recounted that as far back as 2010, Pollard "developed an interest in consensual sexual role-plays involving dominant and submissive roles [and] hired prostitutes 1-3x/week to engage in these types of role plays." Samenow Report at 5. He explained that Pollard, "also engaged in sexually exploited behavior with minors. He initiated sexualized chats, sent sexual abuse images of other children, sent sexual images of himself, and convinced the victims to also produce and send him child pornography images/videos. Mr. Pollard would send many of the victim's money for producing child sexual abuse material." *Id.* at 8. Whether it was online or in person, Pollard actually does have a pedophilic disorder which makes him exceptionally dangerous to children, apparently, no matter his age or medical condition.

### III.   There Is No Telling How Pollard Will Offend Upon His Release

Pollard suggests that this Court can protect the public and deter Pollard's future criminal activity by only sentencing him to the minimum mandatory sentence of 10 years. DE 32: 4-6. Pollard cites multiple studies regarding age as a mitigating factor. But what Pollard argues strongest is the most troubling fact about Pollard: "no one can predict whether Mr. Pollard in particular will reoffend upon release from prison." DE 32:5. Pollard is correct; no one knows what he will do when released.

The recommended guideline sentence is not based upon what Pollard will do; it is based on what he has done. Not a single offense characteristic that builds the guidelines in this case are

based upon predicting future crimes. It is based upon his conduct in this case and past cases. It is based upon the severity of his actions in this case, the actions he alone committed. And despite each study that Pollard cites, not a single one can predict what Pollard will do. Those studies would help, as Pollard reminds the Court, in determining if he should be civilly committed upon his release, or what level of supervision he should receive from probation. They are not an indicator of what level of punishment this Court should impose. The video Pollard requested of a toddler performing oral sex on its mother is why a severe sentence; a sentence that will deter Pollard and others like him from using the internet to sexually abuse children.

**IV.   Pollard's Disagreement With The Guidelines Is Not A Reason To Vary**

The guidelines in this case were created using 2G2.2, but this is an enticement to produce child pornography case. Whereas the defendant cites to the United States Sentencing Commission 2021 Federal Sentencing of Child Pornography Non-Production Offenses Report, it would be more helpful for this Court to consider the 2021 Production Offenses Report, because the distribution, receipt and possession of child pornography were only possible because of Pollard's enticement to produce child pornography.

In October 2021, the United States Sentencing Commission released its report on Federal Sentencing of Child Pornography Production Offenses (2021 Report)[7]. The 2021 Report looked at 512 offenders sentenced under U.S.S.G. § 2G2.1 in 2019. *Id*. at 9. The 2021 Report found that in the 15 years since 2005, there has been a 422% increase in the number of production sentencings. *Id.* at 17. As technology became more widely accessible and easier to use, so did the number of offenders become more plentiful. The 2021 Report found that, like Pollard, more than one-half the offenders qualified for the Repeat and Dangerous Sex Offender Against Minors

---

[7]https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf

enhancement, which, notably has more than doubled in the last 10 years. *Id*. at 19.

What had not changed was the "average" sentence imposed over the past 15 years, hovering right around 275-280 months in both 2005 and 2019. *Id.* at 21. In fact, more than 50% of offenders received some type of downward variance, likely attributable to the fact that so many had a sentencing guideline range of Life (*Id*. at 22); thus, anything less than Life imprisonment would be a variance.

But what the 2021 Report really looked at was offender's relationship to their victims. The project coded for "(1) the physical *proximity* and relationship between offenders and victims; (2) the offender's *participation* or involvement with minor victims during the production offense; and (3) the offender's *propensity* to engage in child pornography activity or child sexual abuse outside of the instant production offense." *Id*. at 9. Of the 512 cases of child pornography production examined, more than 56% (n=290) cases had one victim, 102 cases had 2 victims, 31 cases had 3 victims, 19 cases at four cases, and 58 cases, *like Pollard*, had more than four victims as evidenced in the chart below:



*Id.* at 27. And much like Pollard's crimes used the Internet, the 2021 Report found, "given advancements in technology and social media use by both offenders and minors, close physical

proximity is no longer necessary for offenders to produce child pornography. An increasing number of offenders [(nearly 40%)] exploited victims remotely through the internet or the use of mobile technology to produce child pornography." *Id.* at 29. The 2021 Report noted, "due to technological advancements and the changing nature of production offenses, the largest individual category of child pornography production offenders were internet strangers who met their victims through an online or remote platform (35.4%). Comparatively [to the 2012 Report], only 14.3 percent of offenders in fiscal year 2010 were internet strangers who met their victims online." *Id.* at 30.

Pollard fit the upper echelon of online offenders who produce child pornography. He wanted to have an online relationship to sexually violate young girls because it was safe for him (or so he thought). In fact, of the 512 cases of child pornography production examined, the most used methods of production were by smartphone, tablet, or victim self-produced (totaling 83.6%). *Id.* at 34. The Commission also found that 40% of the production offenders "incapacitated, coerced, or <u>enticed a minor victim</u>, or misrepresented their identity to facilitate the child pornography production offense." *Id.* at 37. Like Pollard, nearly 70% of production offenders, possessed and distributed non-produced images, and participated in the online child pornography community. *Id.* at 40. And Pollard even fit within the unique 12% of offenders who provided gifts or incentives to produce of child pornography. *Id.* at 38. To that end, the "average" sentence was around 1 year higher than the mean sentencing average of 275 months only based upon this one category. *Id.* at 49.

The analysis of the 2021 Report makes clear that Pollard is not a low-end, single victim, short-term offender. He was prolific in his production and enticement, doing so for more than a half-a-decade, unchecked, upon at least hundreds of victims. He is not the "average" offender. He

violated girls or the mothers of small children half-way around the world, communicating to each of them to have them to produce child pornography. And if that was not enough, he engaged with others to share child pornography, trading them as if they were baseball cards. PSR ¶¶ 35-36.

Pollard would have this Court believe the guidelines are unfair, too strict, and out of touch. That argument has been made by defendants for decades, and will continue to be made, because child exploitation cases generate some of the higher sentencing guidelines. Historically, this was not always the case.[8] But over time, as Congress, the Sentencing Commission, and our Courts have learned more about the dangers of in-person and online child exploiters, the sentencing guidelines have increased. The defendant noted that Congress and the sentencing commission have been presented with and offered arguments that the guidelines may need revision. Never once have they decreased the guidelines; if anything, they have added more enhancements, increased the maximum sentences and created more minimum mandatory sentences, all the while trying to keep up with the new dangers cause of online child-exploitation offenders and protect children.

There can be no doubt the "prevention of sexual exploitation and abuse of children constitutes a government objective of *surpassing importance*." *New York v. Ferber*, 458 U.S. 747, 757 (1982) (emphasis added). The *Ferber* Court stated, "[i]t has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults." *Id*. at 758 n. 9. To that end, "the greater the harm the more serious the crime, and the longer the sentence should be for

---

[8] The original 2G2.2 Guidelines, entitled, "Transporting, Receiving, or Trafficking in Material Involving the Sexual Exploitation of a Minor," had a base level offense of 13, a two-level increase if the minor was under age 12, and at least a 5-level increase for distribution. https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_2_E-K.pdf. In fact, USSG 2G2, Sexual Exploitation of a Minor, had only two guidelines: the former mentioned and production of child pornography which had a base offense level of 25 and a two-level increase if the minor was under age 12. Oh, how far we have come.

the punishment to fit the crime." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just desserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct.  From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.   (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*Id.* Punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion. *See Gregg v. Georgia*, 428 U.S. 153, 184 n. 30 (1976).  This is especially true when, "[c]hild sex crimes are among the most egregious and despicable of societal and criminal offenses…" *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009) (discussing how courts have upheld lengthy sentences in cases involving child sex crimes as substantively reasonable).

The government would point out that although the 2G2.2 guidelines were used in this case, they contemplated nearly all of the defendant's criminal activity.  He was awarded the highest of every single special offense characteristic (SOC) available because his crimes touched many of the worst possible attributes of child exploitation (PSR ¶¶ 59-64).

The defendant argues that the guidelines are simply too high because several of the SOC's that increased his offense level by 23, are applied in a majority or "virtually all non-production" cases. DE 32.  However, <u>this *is* an attempted enticement and production of child pornography case involving toddlers, and young teenagers</u>. The defendant produced (or at least attempted to do so) child sexual abuse material.  He traded pictures of sexual abuse children like they were baseball cards.   The  guidelines  are  exceptionally  high  and  nearly  every  SOC  applies  because  the defendant's crimes were horrible.  The guidelines are appropriate because they consider all of the

defendant's criminal activity against multiple victims. They also consider a range of his activity, from the age of the children to his distributing child pornography, to the type he possessed.

Thus, at bottom, and as always, the Court is left to consider the defendant's actual offense. Put simply, the defendant's crime is a serious one and should be treated that way. Pollard did not only distribute or receive or possess child pornography…he made it, produced it, and solicited young teenage foreign girls and toddlers whom he dominated, to give themselves over to him.

## CONCLUSION

Pollard asks for a light at the end of the tunnel, but what light do the children get whom he had sexually abused by their mother or themselves? They have no light; they were toys for which Pollard could amuse himself and become sexually gratified. Wherefore, the United States, requests this court sentence the defendant within the guidelines, and if the Court does vary downward, to not les than 360 months followed by lifetime supervised release, restitution, forfeiture, and appropriate assessments.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By: *s/Gregory Schiller*
GREGORY SCHILLER
ASSISTANT U.S. ATTORNEY
Court ID # A5501096
500 Australian Avenue, Suite 400
West Palm Beach, FL 33401
Phone: (561) 209-1045
Email: gregory.schiller@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on February 7, 2022, I electronically filed the foregoing document with the Clerk of the Court, and served a copy upon all counsel of record, using CM/ECF.

By: *s/Gregory Schiller*
Gregory Schiller
Assistant United States Attorney